UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-10222-RGS

AKIKO OHATA WHITE, Individually,
and as Executrix and Ancillary Executrix of
Estate of NATHAN DENNIS WHITE,
Deceased, and on behalf of COURTNEY
AYAKO WHITE, a minor, AUSTIN
YAMATO WHITE, a minor, and
ZACHARY NATHAN WHITE, a minor, As
Their Mother and Next Friend

v.

RAYTHEON COMPANY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

December 17, 2008

STEARNS, D. J.

This case arises from the tragic death by "friendly fire" of Lieutenant Nathan White, a United States Navy combat pilot. While on patrol in the skies of Iraq, Lt. White was killed when his F/A-18 fighter plane was struck by an errant Patriot missile. The Patriot missile system is manufactured by defendant Raytheon Company.

BACKGROUND

Akiko Ohata White, Lt. White's spouse, brought this lawsuit against Raytheon on behalf of her husband's estate and the couple's three minor children. The Amended Complaint sets out four theories of recovery: (1) negligence in design and manufacture; (2) breach of warranty; (3) punitive damages resulting from gross negligence; and (4) violations of Mass. Gen. Laws ch. 93A. Each claim depends on the allegation that "the

shoot-down incident was caused by a malfunction in the Patriot Air & Missile Defense System." Amended Complaint at ¶ 3.6.  The Amended Complaint alleges that Raytheon knew of the Patriot system's defects, yet nonetheless marketed a product that was "not reasonably fit and safe" for its ordinary purposes.  Id. at ¶ 5.4.  The Amended Complaint further alleges that Raytheon breached its "duty to design and manufacture its Patriot Air & Missile Defense System in such a way as to eliminate or significantly reduce the possibility of product and system malfunctions that result in misidentification of United States and allied aircraft as enemy missiles, and to eliminate or significantly reduce the possibility of fratricide incidents, such as the incident that killed Lt. Nathan White."  Id. at ¶ 14.3.

On June 26, 2007, Raytheon moved to dismiss the Amended Complaint, contending that it raised a non-justiciable political question, namely the discretionary decision of the Army to deploy the Patriot system in "Operation Iraqi Freedom."  On December 19, 2007, the court denied Raytheon's motion to dismiss, and the parties began discovery.  Among other requests, plaintiffs sought to depose three current or former Army officers who are said to have "first-hand knowledge of the shoot-down incident."  Raytheon served a number of document requests on the Army, including requests for reports of the investigation of the shoot-down, communications between the Army and Raytheon regarding the incident, and information concerning the Army's missile defense operations, including the Patriot system's rules of engagement.  On June 2, 2008, the court stayed discovery to give the United States an opportunity to determine whether to intervene in the litigation.

On September 5, 2008, Peter Geren, the Secretary of the Army, asserted a state secrets privilege on behalf of the United States. In a Declaration filed with the court, Geren identified two categories of information implicated by the Amended Complaint, the detailed disclosure of which he believed would jeopardize national security.

> (A) Technical information regarding the design, performance, functional characteristics, and vulnerabilities of the PATRIOT Missile System. Specifically, such information as it pertains to the PATRIOT's Identification Friend or Foe (IFF) systems and its Classification, Discrimination and Identification (CDI) software. IFF refers to the ability of the PATRIOT to determine whether an incoming object is friend or foe often by interpreting signals sent from the object. CDI refers to the PATRIOT's ability to discern the type of object it detects on radar to determine whether an approaching object is an aircraft, a TBM or another type of missile.
>
> (B) The rules of engagement authorized for, and military operational orders applicable to, the PATRIOT Missile Battery that fired the missile that destroyed Lieutenant White's aircraft.

Geren Decl. ¶ 18.

## DISCUSSION

The state secrets privilege "is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." In re Sealed Case, 494 F.3d 139, 142 (D.C. Cir. 2007), quoting In re United States, 872 F.2d 472, 474 (D.C. Cir. 1989). Pursuant to Fed. R. Civ. P. 34, the United States may claim a privilege against the discovery of military and state secrets through a Declaration "lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." United States v. Reynolds, 345 U.S. 1, 6-8 (1953).[1] The

---

[1] Secretary Geren testified to having given such personal consideration to plaintiffs' claims. Geren Decl. ¶ ¶ 15, 17.

assertion of the privilege is not, however, immune from all judicial scrutiny.

> Notwithstanding the deference due to Executive Branch claims of privilege, the Supreme Court instructed in Reynolds that the state secrets privilege is not to be "lightly invoked," 345 U.S. at 7, because, as this court has observed, once invoked, the privilege is "absolute" and "cannot be compromised by any showing of need on the part of the party seeking the information," Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 399 (D.C. Cir. 1984). Accordingly, this court has emphasized that the district court must scrutinize the claim of privilege more carefully when the plaintiff has "made a compelling showing of need for the information in question," Ellsberg v. Mitchell, 709 F.2d 51, 59 n.37, 61 (D.C. Cir. 1983), cert. denied, 465 U.S. 1038 (1984); see Reynolds, 345 U.S. at 11, and this court's review of the district court's determination that the "affidavits [are] adequate to establish the reasonable danger of injury," is for abuse of discretion, Halkin II, 690 F.2d at 991. To sustain the assertion of privilege, the district court need not have complete knowledge of how disclosure would cause a specific security breach, see In re United States, 872 F.2d at 475; it is sufficient that the reports present "a reasonable danger of divulging too much to a 'sophisticated intelligence analyst,'" id. (quoting Halkin v. Helms, 598 F.2d 1, 10 (D.C.Cir.1978) ("Halkin I")). As the Supreme Court observed in Reynolds, where it is possible to determine "from all the circumstances of the case" that such danger exists, "the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." 345 U.S. at 10.

In re Sealed Case, 494 F.3d at 144.

The privilege protects a broad range of state secrets, including information that if disclosed would result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." Ellsberg, 709 F.2d at 57 (footnotes omitted). Accord Kasza v. Browner, 133 F.3d 1159, 1166 (9th Cir. 1998).[2]

---

[2]As the United States cautions in its Statement of Interest, "the privilege extends to protect information that, on its face, may appear innocuous but which in a larger context could reveal sensitive classified information. After all, it is a 'practical reality' that 'in the course of litigation, classified and unclassified information cannot always be separated.'

An assertion of the state secrets privilege must be "accorded the 'utmost deference' and the court's review of the claim of privilege is narrow." Kasza, 133 F.3d at 1166; Zuckerbraun v. Gen. Dynamics Corp., 935 F.2d 544, 547 (2d Cir. 1991). Aside from ensuring that the privilege has been properly invoked as a procedural matter, the substantive determination for the court is solely whether "under the particular circumstances of the case, 'there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.'" Kasza, 133 F.3d at 1166, quoting Reynolds, 345 U.S. at 10. See also In re United States, 872 F.2d at 475-476.

> When the state secrets privilege is successfully invoked, "[t]he effect . . . is well established: '[T]he result is simply that the evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of the evidence.'" . . . In general, against a motion to dismiss, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1968 (2007), "construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006). In the context of the state secrets privilege, the court has recognized that where, as here, the plaintiff is not in possession of the privileged material, "dismissal of the relevant portion of the suit would be proper only if the plaintiff[ ] w[as] manifestly unable to make out a prima facie case without the requested information."

In re Sealed Case, 494 F.3d at 144-145, quoting Ellsberg, 709 F.2d at 64 & n.56.

Plaintiffs contend that they can prove their claims against Raytheon without resort

---

. . . [C]ertain cases require the restriction of 'parties' access not only to evidence which itself risks the disclosure of a state secret, but also those pieces of evidence or areas of questioning which press so closely upon highly sensitive material that they create a high risk of inadvertent or indirect disclosures.'" See Memorandum in Support of Statement of Interest, at 6, quoting Bareford v. Gen. Dynamics Corp., 973 F.2d 1138,1143-1144 (5th Cir. 1992).

to secret or privileged information. In this regard, plaintiffs direct the court to the following allegations in the Amended Complaint: (1) Raytheon designed, manufactured, marketed, distributed, sold, and supported the Patriot missile system, including the system implicated in Lt. White's death, (¶ 4.2); (2) the shoot-down of Lt. White's fighter jet was caused by a malfunction in the Patriot system (¶ 3.6); (3) the malfunction caused the system to erroneously lock-on and launch a missile at Lt. White's aircraft (¶ 3.7); (4) the malfunction caused the system to misidentify U.S. and allied war planes as enemy missiles (¶ 3.8); and (5) misidentifications occurred with alarming frequency and were well-known to Raytheon before the incident involving Lt. White (¶ 3.7).

Raytheon counters that prior to the April 2, 2003 shoot-down, the Army, through its thirty-five years of experience with the Patriot, had "(1) established acceptable limitations of the Patriot's target identification capability and performance; (2) knew of such limitations but decided to proceed with wartime deployments in Operation Iraqi Freedom; and (3) concluded that this accident could have been prevented had the Army Patriot operators followed proper military procedures and doctrine on April 2, 2003." Reply Brief, at 2-3. However, Raytheon maintains that it is unable to prove these assertions without the use of privileged information, including details of the Patriot system's design specifications and operational requirements (especially those related to target identification and classification capabilities and acceptability); the Patriot system's conformance with these requirements; the Army's knowledge of and acceptance of the target identification limitations of the Patriot; and the conduct of the Patriot system operators on April 2, 2003. Raytheon, in pressing its motion to dismiss, relies on In re Sealed Case, 494 F.3d at 149 ("[W]hen the

6

district court can determine that the defendant will be deprived of a valid defense based on the privileged materials, it may properly dismiss the complaint."); see also Tenenbaum v. Simonini, 372 F.3d 776, 777-778 (6th Cir. 2004) (same).

Raytheon also argues that a defense shorn of relevant privileged information will lead the jury to a false or mistaken verdict.

> If the Plaintiff has her way, she will attempt, among other things, to convince a fact finder or jury, on a record devoid of the privileged information, that prior to the April 2, 2003 incident, the United States did not know of the possibility that the Patriot could misidentify a target; that the United States had not established acceptable failure rates for the target identification capability or that the United States had not otherwise accepted this performance limitation as adequate for wartime deployments; and that the United States did not conclude that the April 2, 2003 incident could have been avoided if the Army Patriot operators had followed required procedures. Indeed, as noted, direct, contrary and unrebutted evidence already on the record suggests that the truth of each of these propositions is exactly the opposite of what Plaintiff would attempt to prove. Plaintiff's only response to such unrebutted and crucial evidence is that it is "preposterous" and "inconceivable."

Reply Brief at 3-4. See also Molerio v. FBI, 749 F.2d 815, 825 (D.C. Cir. 1984) ("Although there may be enough circumstantial evidence to permit a jury to come to that erroneous conclusion [that defendant's conduct was illegal], it would be a mockery of justice for the court - knowing of the erroneousness - to participate in that exercise.").

Raytheon contends that it will be unable to raise a government contractor defense without the use of the technical and operational information over which Secretary Geren has asserted the privilege.[3] For instance, to prove the "government specifications"

---

[3]The government contractor defense shields manufacturers of products made for the United States government from state tort liability for flaws in product design when it is determined that a "significant conflict" exists between the federal interest and state law. "State law is displaced where judgment against the contractor would threaten a

7

element of the defense, Raytheon maintains that it must produce the Patriot missile's Technical Data Package, its specifications, and the design drawings.  See Boyle, 487 U.S. at 512.  Similarly, Raytheon argues that proof of the state of its knowledge regarding any potential malfunctioning of the Patriot will require exploration of the vulnerabilities of the system, as well as certain counter-measures that affect the Patriot's performance.

Raytheon also asserts that plaintiffs cannot prove their defective design and manufacturing claims without divulging classified information.  "Plaintiffs will necessarily need access to, among other things, the technical specifications and manufacturing processes of the Patriot System in order to prove either a design or manufacturing defect." Memorandum in Support, at 3; see also Geren Decl. at ¶ 19.  Similarly, plaintiffs will need to challenge the Army's conclusion that the performance of the missile battery involved in the incident was affected by an "electromagnetic anomaly."[4]

Lastly, Raytheon argues that neither the court nor the trier of fact could adjudicate the causation element of plaintiffs' claims without access to the Patriot system's rules of

---

discretionary function of the Government."  See Boyle v. United Techs. Corp., 487 U.S. 500, 501 (1988).  "In sum, state law which imposes liability for design defects in military equipment is displaced where (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id. at 512.  "Without the defense, the government's own tort immunity for its discretionary functions would be undermined. Contractors held liable for design features that were the subject of discretionary approval by the government would predictably pass on the costs of liability, ultimately imposing costs on the government that its immunity was intended to preclude." Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1315 (11th Cir. 1989).

[4] The Secretary's claim of privilege specifically covers information related to the degradation of the system's performance, including "natural" and "induced phenomena." Geren Decl. ¶ 19(H).

engagement and the tactical orders given to the Army operators of the involved Patriot battery.  See Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486, 1496-1497 & n.17 ("In determining whether a manufacturing defect was the proximate cause of the deaths of the Marines, an examination of the relevant decisions rendered regarding when and how the missile would be used would be necessary. . . . This information, as set forth in the declarations by the Secretary of the Air Force and Acting Secretary of Defense, is protected from disclosure under the state secrets privilege.").[5]

---

[5]Under Massachusetts law, a superseding intervening cause can, as a matter of law, constitute the sole proximate cause where the "intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm." Kent v. Com., 437 Mass. 312, 321 (2002). Raytheon argues that the record contains significant evidence of multiple examples of intervening conduct by the Army that meets this standard. These include:

(1) the Patriot Battalion Tactical Director's apparent failure, prior to firing the Patriot missile, to "amplify" the data appearing on the Patriot radar screen regarding the perceived target to determine if the latter was truly an enemy target, in violation of the Special Instructions issued by the Coalition Forces Air Component Commander (Dkt # 20-2, Aug. 22, 2003 Letter from Commander, U.S. Naval Forces Central Command at 2.); (2) after deciding to launch the Patriot missile at the target, the apparent failure of the Tactical Director and other Patriot personnel at the Tactical Command Center/Information and Coordination Central to confirm the target's identity, to recognize that the target was taking evasive action, and to prevent the Patriot missile from engaging the target by executing a "hold fire order, which will cause missiles to self-destruct in flight," which order could have been executed "up to the point of missile interception." (Id. at 2-3); (3) the fact that Lt. White may not have placed his IFF transponder in the "on" position to allow for proper identification of his aircraft (See id. at 1); (4) the military's tactical decision to not integrate the Patriot System with the other elements of the theater air defense system (See id. at 3), including the AWACS, which was correctly tracking Lt. White's F/A-18 as a friendly aircraft (See id. at 1); (5) the military's "institutional failure, through training and doctrine, to adequately prepare PATRIOT to be fully integrated into a complex joint battle space" (Id. at 2); (6) the Army's tactical decision to deploy the subject Patriot batteries in a novel and untried configuration (Dkt. #16, Ex. 1,

9

## CONCLUSION

On December 10, 2008, a Department of Justice Security Specialist produced for the court's *in camera* inspection a classified supplemental Declaration by Secretary Geren.[6] The non-public Declaration is a carefully constructed, case-specific consideration of the claims contained in the Amended Complaint and the impact that disclosure of the relevant matter identified by the Secretary would have on the security interests of the United States. After review of the pleadings and the non-public Declaration, I conclude: (1) that the Secretary's claim of privilege is valid; (2) that the information which the Secretary has claimed as privileged is relevant and necessary to prove and defend the Amended Complaint; and (3) that its public disclosure would endanger vital security interests of the United States. While I accept plaintiffs' assertion that a prima facie case could be made against Raytheon based on information in the public domain, I see no practical means by which Raytheon could be permitted to mount a fair defense without revealing state secrets. Therefore, I have no alternative but to order the case dismissed.[7]

---

Fischetti Decl. ¶ 10); and (7) the U.S. military's apparent decision not to restrict the airspace in which the incident occurred (Dkt. # 50, Ex. 4, F/A-I 8 Fratricide Incident Briefing at 8).

Reply Brief, at 15.

[6] In a comprehensive review of the state secrets privilege, the D.C. Circuit concluded that "the district court may properly dismiss a complaint because of the unavailability of a defense when the district court determines from appropriately tailored *in camera* review of the privileged record, that the truthful state of affairs would deny a defendant a valid defense that would likely cause a trier to reach an erroneous result." In re Sealed Case, 494 F.3d at 151 (internal citations omitted).

[7] The additional contents of the non-public Declaration, while covering the same points made in Secretary Geren's public Declaration, cannot be characterized without

The dismissal is entered as a matter of law for reasons of state. The dismissal is not intended to diminish in any respect Lt. White's heroic service or the debt that he is owed by his country.

### ORDER

For the foregoing reasons, Raytheon's motion to dismiss is <u>ALLOWED</u>. The Clerk will now close the case.

SO ORDERED.

s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

risking inadvertent disclosure of highly classified information. I will direct the United States by way of this footnote to make the non-public Declaration available to the Court of Appeals for review should it so request.